Good afternoon. This is judge Cabrera's accompanied by a phone platform by judge Laval and judge Park. And today's calendar includes two submitted cases, 20 dash 2760 Randall Knight versus Matt Nassau County on submission and 20 dash 2584 USA versus Sanders, both of whom will be taken on submission. The one case for argument will turn now to the United States of America versus Richard Lucas 19 dash 3937. And before I turn it over to counsel for Sanders, I note that we will try to be deferential on time, although, although one or another judge may interject the question, but we will give you some additional time if necessary. All right, let's hear from counsel for Santa.  You may please the court. My name is Robert singer. And together with attorney Herbert Greenman, we represent the defendant appellant, Mr. Lucas, in this case, our brief deals, a number of issues. And with the court's permission, I would like to begin and argue sentence the sentencing issue and then issue. And then the next issue regarding whether evidence permitted by the district court was inextricably intertwined with the charge defense. Mr. Green, what time is left? I'd like to argue the search issue with regard to the sentencing issue and plain error review judges. We don't believe that focus on factor three and four plain error review is important because the government essentially conceded these factors in her, in its brief. And on top of that, we believe this court's decision in Gomez instructing Mr. Lucas prevailed on those two factors. So I'll focus my argument instead on factors one and two. We believe that there was an error in this case because the categorical approach applies. And because of two reasons of the changes in the drug schedules. First, since 2015, the New York and the controlled substance tax schedules on the federal law differed because naloxone gel was removed from the CSA, making the New York state statute broader. And secondly, and the government doesn't dispute this either as found in the United States to be Fernandez to bars and the Southern district in New York. Since 1997, New York has a broader definition of cocaine because New York criminalizes three isomers of cocaine rather than the CSA, which only criminalizes two. And we believe that there is an error based on three circuit courts, the ninth, the sixth, and the first that have reached the same conclusion in that case in the United States, but he's tough Williams and Abdul Aziz. All three courts have indicated that there was an error because the way that the court looked at the sentencing factor and the enhancement factor in the guidelines and focusing in on what was going on at the time of the sentence was proper. We also believe that the error is plain in this case. And what we mean by that is that because the error is clear and obvious and not subject to reasonable dispute and not unsettled. First, the most obvious reason is that change that Fernandez to bars addresses, which is regarding the 2003 conviction of Mr. Lucas and the 2019 sensing at that time, the cocaine differences in definition in New York differed from the CSA definition under federal law, and that should cause us to prevail. And on top of that, it removes any timing arguments that the government makes and with regards to the naloxone gel change in 2015, again, why the error was plain in this case is because Harbin and this court's decision in Townsend were precedents. At that time, Townsend discussed how a quote unquote controlled substance under two 2016, which is the New York statute. Mr. Lucas was convicted on is controlled by the definition and narcotic drugs as defined under two 2016 is a controlled substance as Townsend directed. And since they weren't a category match sentencing in 2019, as a result of that, we should prevail on plain error review. Finally, I know the government sites, the sixth circuit decision in the United States to do avoidance for the proposition that plainer you should fail in this case, but we don't believe it should fail for three reasons. First off the cocaine isomer definitions differed in 2003. That's something that's clear under the law, as we cited in our brief, because of the isomers definitional differences under New York law and the CSA. So even if you use McNeil's time of conviction approach or use Townsend's time of sentencing approach, Mr. Lucas wins on both because there's no categorical match at any time at the 2003 conviction. Finally, as Batista and Abdul Aziz discuss, McNeil does not address whether the ACCA should be using a backlog looking approach when assessing controlled substance offense, which is of course, what we're looking at here today. And what about this is judge the Val. I want to ask you, what about the fact that with respect to the different definition of cocaine as to the isomers used, you didn't raise this until your reply brief. What do we make of that? Well, your honor, I guess the first point is what I would say is I respectfully disagree with that. We did raise this in a 28 G letter that was published just after our initial brief. So it was before our reply brief. So I believe that we have not raised it in reply only. I believe we raised it before and the government had an opportunity to address that inside their response and they did not. Um, so we believe this is just part. That was an issue you could have raised in the opening brief. It wasn't hooked to a decision that didn't come out. I mean, you weren't unaware of the argument, uh, uh, until the 28 J letter where you. We, what I would say just part of it. We, we came across this argument when further researching after we submitted our brief on appeal. And that's why we submitted the 28 J letter, which under the rules allow us to do that. And we provided the opportunity for the government to respond back to it, um, in their response brief, since we filed the 28 J letter prior to that. So we don't believe that the issue is we, how much prior, how much prior to the government state for, for, for filing their answering brief. We filed our initial brief in this case in November, 2019 judges, we regarding the Fernanda's of our decision on January 21st and the government filed their response to us in this case in February. So they had approximately two or three weeks, February one. I forget the jet. It would have been February 12th, your honor. So roughly three or four weeks has passed since we filed our, our 28 J letter. Okay. So you're saying the government, if they wanted to, could have asked for more time in any event that they needed it to respond to, um, they could have asked for us to file a supplemental brief if they saw fit, um, but they had the opportunity to reply, whether that was through their response brief or whether that was through another 28 J letter. Like we had traded back and forth on several new cases came out. They had the opportunity judge. And so again, when we look back at this, we believe that when this court applies, it's relaxed standard to clean air review involving sentencing issues. Um, we believe that Mr. Lucas should prevail again. Why is a relaxed standard applied in the second circuit under United States bill Williams and United States began as because correcting an unpreserved error at sentencing is not as great as the trial context. Where, of course you have to have a new trial. And I know recently, as recently as yesterday, Eldridge focused on a supervening change in law. Again, we believe that there's no supervening change in law here. And on top of that Eldridge did not change anything regarding the relaxed standard under sentencing errors. I'm playing there and we believe the error is playing here too. And the most instructive example is of course, judge Wolford, the same district judge has sentenced Mr. Luke in this case, months after the decision on the sentence in this case came to the same conclusion, United States. Now with regard to unsettled under current law, how can it be plain? I am not understanding. It's the big time of sentencing or time of conviction issue. Um, it, it isn't settled in this court. How can that be playing there? I'm not following. Well, judge, we think it's important because number one, the change for the cocaine isomers definition was done in 1997. So we don't believe that that change could not be playing, um, to the defense, to the court, to the probation department, to the prosecutors, because it happens. Right. No, I'm asking about the, uh, the, the, the change in the schedule. With regard to the Naloxone gels, your honor. Correct. So with regard to that change, again, I go back to what Townsend had said, and that was published in 2018, as well as, uh, what Harbin had said, um, which was published back in 2017, where they looked at these things and they did conclude that not only the categorical approach was appropriate, but there was not a match based on the same reason. And so those cases predate also our decision in go in the immigration context, which I think is argued at least arguably in some tension with Townsend, um, that also seems to make it difficult to find that it was clear that the law was clear. And what I would say to that judge Park is that Dovey sessions dealt very strictly with the immigration context as Batista is Williams as a dual disease, even as judge Wolford found in Swinton, that was confined purely to that context and that context alone. Um, and so we don't believe the law was settled on that question because again, it was a very specific finding. And if you look at the statutes that are at play, 35 53 a, if you take a look at the guidelines at play, as judge, um, Wolford pointed out under one B 1.1 11, um, all of those things focused on the time of sentencing approach for these enhancements. Because under this decision, under the court's decision in Alonzo, uh, where the career center guideline predicates are strictly interpreted, the government's burdens approve these enhancements as well as the rule of lenity, all of those weigh in favor of finding that this needed to occur much different than dopey sessions looked at in that particular immigration context, whereas all of course it said it was limited to looking back at the conviction at the time of conviction, because that's what the removal context really matter. I know my time has expired. I'll leave the rest for her. Thank you, Mr. Singer. We'll hear from miss Gregory for the government. Good afternoon. May it please the court, Catherine Gregory, assistant us attorney representing the United States. I want to start with two points about that career offender designation. First, the government does not concede, um, either the isomer cocaine issue or that the state and federal drug schedules are no longer comparable. And to the extent that our brief makes note of the divergence, you know, in 2015, we're simply assuming it for the sake of argument because the government believes this is primarily a timing issue where this issue is now being raised directly in the district court. The government is explicitly taking the position that these schedules are compatible even after that removal of naloxone on 2015, but secondly, the court. What about the isomers? What about the isomers? Well, I, but I haven't, they clearly been, haven't they, hasn't the state law since the 1990s clearly allowed certain things as cocaine, which. Which federal does not. No risk respectfully because Lucas did not raise this issue. The district court was not able to analyze the intricacies of these drugs schedules, um, such as the chemical makeup of positional isomer cocaine or derivative substances or the other complex points of chemistry. Um, and I, and at this point, because he did not raise it, it was not argued. The district court preferred performed no analysis or Mr. Singer said that they raised in a 28 J letter that the government had at least a few weeks to, uh, to incorporate into its, uh, opposition brief, if not ask for more time. That that's correct. We did have the 28 J however, the proper forum for a factual inquiry that we believe would be necessary to make that determination would be the district court. Um, and, and this record as it stands is insufficient to argue. We would have to introduce potentially affidavits or expert testimony as to these chemical makeups. And the record is just insufficient at this point. And that's why or the matter could be, or the matter could be remanded to the district court to do exactly what you say. Yes. I I'm yes. And what I was trying to explain is why we did not dive into do a deep dive into the chemical makeup, um, in response to that 28 J letter, it's just not a feasible or appropriate at this stage for us to do what we would need to do, um, which is why I also bring up that we are raising this argument when the issue is coming up directly in the district courts now. Um, and I believe it's come up in, in Clinton and another case in front of judge Wilford. But the court shouldn't reach this issue again, because this is, as Mr. Lucas concedes plain error review. Um, if we look at the, the, the time of conviction versus time of sentencing, when we compare those schedules, the time of conviction is the correct approach for, for a number of reasons. First, it promotes fairness notice due process, a defendant who is convicted in state court would know whether the drug schedules are comparable. The day that he is convicted on his state case, he knows that he could face that enhancement before he violates the law. And that's exactly the reasoning the Supreme court put forth in McNeil. He, as this court put it in dough, he wouldn't be subject to the fortuities of either his federal sentencing or for that matter, DEA rulemaking, which as the court observed in dough, the DEA has added and removed something like 160 different types of substances over the last 50 years. So while today, Mr. Lucas's approach could work in his favor, if in a year or two or 10, these schedules change again and encompass more predicate offenses, he would be right back here arguing that examining the schedules at the time of federal sentencing is unfair. This time of conviction, time of prior conviction approach ensures that defendants know exactly what their status is good or bad before they violate the law. This approach also aligns with the objectives of that enhancement, the backwards looking provision, just like in McNeil, not the same one, but it's concerned with the convictions that have already occurred. So looking at those schedules as they stood at the time of that conviction captures that past defense more accurately than trying to compare a 20 year old state statute with the DEA's current policies and rulemaking. As this court noted in dough, it also makes sense categorically because you're looking back at the state statute and corresponding drug schedules. Then, and although this court, I don't think has addressed this issue directly, it seems to be in line with the leanings in other criminal cases. As recently as this year in McLeod, the United States, this court observed that the district court hadn't considered quote, whether at the time of his 2000 New York drug conviction, the applicable state's drug statute was more expansive than the corresponding federal schedule. And quote, now all of this is to say that even if there was error, despite dough, despite the Supreme court's decision to McNeil, it certainly was not plain given all of this precedent. And that's exactly the conclusion. The sixth circuit came to in that Williams case that we cited in our 28 J where, even though it's unfortunately for us, it's agreed with the government's suggested approach. It recognized that because of McNeil, because of recent six circuit precedent, it was not plain. So it's still affirmed the sentence in that case. And I believe the concurrence actually argued in favor of the time of conviction approach citing among other things, Dobie sessions, I believe. Go ahead. No, good. You go, you go. I was going to go ahead. Uh, I was just going to ask Ben, you're asking us to create a split with Batista or the ninth circuit. Is that right? I, I, I don't know the short answer is no, because Batista doesn't really address McNeil. Um, and it doesn't, it, the initial Batista decision didn't even mention McNeil. I think it was four months later. They issued a revised opinion with two sentences addressing McNeil and essentially saying, well, sentencing disparities happen all the time. So McNeil doesn't really apply here. Um, I don't think that Batista really did a deep dive into the, into McNeil or, or why it's distinguishable from this matter. And I don't know that this court should reach the merits of that, um, issue right now, except to say that even if there was error, it was not plain. Given the state of the case law, this court is looking at this issue in another pending case, USC Gibson. Um, which I believe I put in a footnote in our brief, um, the citation to it, but that was raised in the district court in Gibson and it's still pending before this court. So that, that one might be a better vehicle to address this head on. But I believe that Abdul Aziz and Batista get it wrong. They don't do a very thorough job of distinguishing McNeil. Um, and, and I think Abdul Aziz actually addresses Doe v. Sessions and just says, you know, the second circuit got it wrong. And the third circuit misapprehended the law. It's a very conclusory, I think, um, uh, rejection of this court precedent. And I think it's different in the ninth circuit, uh, because the second circuit has this Doe v. Sessions case, it has Townsend. Both of these cases were out before Mr. Lucas was sentenced. And I don't think that you could really say here that the law was clear. I, and I mean, if it's, if it was that clear, certainly Mr. Lucas would have raised it. Um, and he, and he just didn't, we didn't engage in the analysis either on timing or on the substantive makeup of those drugs schedules. So it's, it's, I'd like to ask a question as I understand your argument, you are relying exclusively on the, or primarily on the plain error aspect, and you are not relying on the fact that the, that the defendant didn't raise it in a way that you are, you are leaving us free to deem the argument, uh, because it was raised in the, in a 28 J letter, uh, a few two, three weeks before your brief was due, um, you are leaving us free to deem it as if it had been raised in the defendant's initial, initial brief. No, no. And, and no, and I want to point out that the 1997 date, uh, and only mentioned, I believe in the reply brief, that while the case is cited in the 28 J letter, it just, it's difficult to respond to that for two reasons, because it's not in the primary brief, it was in 28 J letter, and none of this was substantively addressed below. And it's just so fast. So you say that the 28 J letter did not, did not mention the, the, the isomer difference, the isomer difference had not been mentioned, was not mentioned, uh, by the defendant until the reply brief, is that true? No, I'm looking at, I'm looking at the Fernandez-Tavares, I'm looking at the 28 J letter and it's about the New York penal law, um, let's see, uh, talking about the categorical approach of cocaine sweeping more broadly, um, and talking about the difference between narcotic drug and cocaine. So I, I don't see the 1997 definition here. Um, it, it might've been mentioned because this is a 1998 conviction in the, uh, Hernandez, excuse me, in, in the case that was cited in the 28 J. But again, I would say for both reasons, it's, it's, it shouldn't address that on the merits because it wasn't raised and because it was only raised tangentially in the reply or in the 28 J and then more in depth in the reply brief. I'm sorry, one more minute. And it sounds like also you're, you're making the point that I don't know what a positional isomer of cocaine is, um, but it sounds like you're saying that whether it's a categorical match depends on some, uh, I don't know, facts, science, discovery. Yeah, exactly. Your Honor, that's exactly the point I'm trying to make. And again, you know, I was, we didn't want to do this deep dive into chemistry without the appropriate record, which we think would require things like affidavits from scientists about these positional isomer cocaines. And I, I myself certainly am not qualified to talk about, you know, what these are or are not. And I believe that this should be a factual inquiry if, and you know, for the district courts, which is what we're doing now in this district is how we're proceeding. So where, where this issue is currently coming up, that's where we are arguing about the schedule. So, um, unless there, I'm sorry, go ahead. No, I'm just, as a matter of procedure, do we have, I'm a little confused about the procedural posture here. Do we have yet to hear from both sides on the issue of, uh, of, of search warrant and the like? I don't believe the appellant addressed that yet. That's yeah. Okay. That's fine. Would you like me to address it now? Yeah, let's have, that's okay. And then we can come back to the defense. But while you're, while you're up and ready to go counsel, I just wanted to address that. Yes. I believe my time is close to, or has expired. So I will try to be brief. Uh, the entirety of Mr. Lucas's argument on the motion to suppress seems to be based on disregarding the district court's credibility determinations and accepting his version of the facts. And then beyond that, I'm interested in, I'm interested in the part about the, about the search warrant for room one 13, because I, I, I must tell you that I found the government's brief extraordinarily confusing and unhelpful as to the, particularly as to what was said to the magistrate who issued the search warrant. Um, uh, in which in many instances, your brief characterized it by vague generalizations. Talking about, he was told that they relationship between, um, uh, Daniel and, and, um, uh, and Lucas, um, without saying what he was told. Um, and, uh, and also that, um, uh, that Lucas was suspected of drug dealing without saying what facts were the basis and without being precise about what facts in your brief were learned by the government before and known at the time of the presentation to the magistrate and which were not learned until later. Um, uh, I found it very, very difficult to follow your brief with respect to the timing of, of, of, of what, what was learned before and what was learned after. So, uh, I would like to hear a clear statement from you as to what was the search warrant for room 113 and whether there should have been a Frank's hearing. So if you would proceed to that. Yes. Uh, I apologize to the extent that the brief was unclear and I will try to clarify now. So from my understanding of Mr. Lucas's argument, it was primarily a fruit of the poisonous tree. So if we look at his brief, I believe we're on page 50 to 51. Um, he talks about part of it came from the possession of the key in, uh, in his possession at the time of the arrest. And part of it became, uh, the, the canine hit on the storage locker. Um, I think after the judge issued the warrant. Now I would defer to judge Wolford's decision on this in the record where she discusses why the Frank's hearing was not necessary. For example, she analyzed the timeline in much more detail. Um, and she determined that, you know, that as a credibility determination, there was no bad faith here, um, that the, the, I'm sorry, uh, uh, you may want to defer to the magistrate judge, um, to the judge, but, uh, but, but I don't defer to the judge on issues of law. We don't defer to the judge. And I, it seems to me you're avoiding rather than answering my question. The defendant has made a huge number of arguments seeking to suppress and some, and some of them are, are, are less meritorious than others. And for you to point to arguments that are bad, that he made doesn't answer all the arguments. So what I'm asking you is to tell me what was the probable cause that what was said to the judge in the issuance to procure the issuance of the search and what information did the government have at the time, as opposed to information that cited in your brief, that wasn't learned by the government until after that search warrant had been sought and, and obtained, um, you speak, you speak in a vague way about the issuing magistrate being told about a relationship that there was a relationship between Daniel and, um, and Lucas. What was he told? Um, you, you speak about, um, the magistrate issuing the warrant being told that Lucas was a suspect, uh, with respect to narcotics dealing. What was told about being a suspect? Just saying someone is a suspect is not, is not probable cause. Um, and I think I'm correct in saying that the information obtained by the drug dealing, uh, in an interview with agent that I believe that didn't happen until after the issuance of the search warrant, am I right or wrong about that? I try and try. I tried very hard to find the answer from your brief, but had real trouble. Yes, your honor. I, I apologize. I do not know those details at this moment, and I apologize, but I do not want to misstate the record. Well, that's pretty important. It's pretty important, isn't it? It's pretty important because if, if, um, if Lucas, as, as your brief seems at times to imply, if Lucas had already acknowledged, uh, that he was engaged in big time drug dealing and that he had 30 to $90,000 in a safe at the comfort in, which were the proceeds of or involved in that drug dealing, uh, it's a pretty easy question that there was plenty of probable cause, but if those things weren't learned until later, when Lucas was interviewed, if it was later that Lucas was interviewed by agent, then those things don't help at all with respect to the search warrant. Um, so, uh, uh, I don't understand for the life of me why you don't know which, which happened first. But, um, well, Mr. Lucas's argument, and I'm quoting is because the dominant reason for obtaining or excuse me, that the taint of the unlawful arrest should have caused the warrant to fail because the dominant or the predominant reason for obtaining the warrant was the seizure of the key, which was in his possession at the time of arrest. So that he's, he's arguing verbatim, the taint of the unlawful arrest should have caused the warrant to fail. So that is why our argument mistakenly clearly, uh, focused on the lawfulness of the arrest itself. If, if you're telling me that you're, that you're simply can't answer, Michael, you can't, you can't tell us what, what information the government had and communicated to the magistrate in support of obtaining a search warrant for a month, 13. At the moment, I would be happy to do it in less than a page and submit it to the court within 24 hours, if that would assist the court. And again, I do apologize. I don't want it to be in less than a page. I want it to be done in a clear manner that permits us to understand the for the search warrant. And if I'm understanding your honor correctly, you're looking for the timing of what they knew and when. I believe that's one of the things that's one of the things that's highly relevant that if you didn't, if you didn't know stuff until after the issuance of the search warrant, you obviously didn't include that in what you said to the magistrate. And my question also seeks to know when you say things in your brief, like the majesty, the issue of the magistrate of the search warrant was told that, um, that Lucas was suspected of drug dealing. What was told, what were facts rather than that somebody suspected him that amounts to nothing. And you say that he was told about a relationship. He or she was told about a relationship between Daniel and, and, um, and Lucas, what was told, what was said, and which is part of the issue about whether a. A Frank's hearing, uh, was or wasn't necessary. Was the, were things said in support of the search warrant that simply weren't true or that overinflated, um, the facts that might require a Frank's hearing. These are the issues that we face. Yes. And I believe part of the issue came up because the, the, the, um, the notes were the judge, I believe judge cases notes were, um, not as detailed as one would like, however, I believe that, um, they advised or that Dominic Daniels had previously met with Mr. Lucas, um, who they described him as a known cocaine dealer at room one 13. Um, the notes indicate that Dominic Daniels had earlier been arrested for an alleged drug transaction with a bag of cocaine and a key to room number one 13, um, and the agents, I believe. Well, I think you better put this in. I think you better put this in writing. I agree. I agree. It needs to be stated with, with considerable precision. You also told us your brief also tells us that, um, that, that I believe it was presented as part of the justification for the search warrant that Daniel was that the fact that Daniels had a key to room one 13 was not learned until after the issuance of the search warrant. Um, um, if, uh, whatever is true, I mean, the, the, the, the difference would be significant if Daniel had a key that was, that was known to be a key, a key card to room one 13. At the time he was arrested with a large quantity of cocaine, that would be very important, uh, information in support of a search warrant for that room, but if you didn't learn the fact that the key card in Daniel on Daniel's person was to room one 13 until after the issuance of the search warrant, it obviously doesn't support the, um, the issuance of the search warrant. And I think they, I think we learned that, um, that, that the agents did not learn that that key card opened room one 13 until in executing the search warrant, they used it to open the door of that room. Um, miss Gregory. Are you there? Yeah, this is Jessica Brown. We have, I think, 15 volumes of the joint appendix rather unusually large. Uh, it is possible, I suppose that the answer to some or all of judge Laval's questions may be found in that voluminous joint appendix. Now, the reason I mentioned this is simply that when you prepare a response in writing, uh, to the panel at the request of judge Laval, I think it of course, give us as many appropriate references as possible to the joint appendix volumes that we have at hand. So we would like as much, this is a long way of saying that we need a quite specific response in writing, uh, to judge Laval's, uh, quite appropriate questions. Of course. Do we understand? Uh, are we in agreement? Let me ask the panel, if they have any further questions on what it is that miss Gregory is being asked to submit. I think that's right. Okay. Well, this is very good. Let's hear from, and we'll give additional time of course, to Mr. Singer or Mr. Greenman, whoever it is that we'll give more than two minutes. Six minutes of rebuttal, six minutes of rebuttal for Mr. Greenman and singer. Yeah, your honor. Um, I am, uh, Mr. Greenman, and I'm just going to talk briefly about the search issues, which judge Laval just, uh, just raised. What happened here was that the police, when they went to judge case, it was a County court judge chose rather than putting information in an affidavit. They chose to go what we call in camera, which is a procedure used in state court, uh, uh, and before the judge and to provide information, the state law requires judge case to make basically detailed notes about the conversation. That he had, uh, and the conversations that he wrote down were untrue. And I don't mean that by judge case, the information provided to judge case was clearly untrue. Uh, there was information that, um, uh, that the police knew that Daniels had gone to room one 13. They didn't know that there was information that he had met Mr. Lucas at the hotel. Mr. Lucas was never even at the hotel until he was outside in the parking lot. And it went on from there. And just about, they have some information about the key that was testimony at the suppression hearing clearly showed that there was no number on their key that was taken from Dominic Daniels, the key, the government did not put the key in evidence, but questions were asked to the officer about what was on the key. And testimony was that they found a key carried, but there was no number room number on key care. So our argument with respect to the search for your honors was not simplistic as the government is saying, simply arguing that there was a taint and there was no attenuation. Sure. That is part of the argument that we made, but we clearly argued that the information provided to judge case was false in any way you looked at it. And we asked the court to conduct a, a Frank's hearing, which the, uh, the district court refused to conduct the Frank's hearing, even though to us, it seemed that there was information that was false, we believe your honor that the search warrant was executed prior to the time that, uh, agents was new ski. Uh, and Webb had finished talking with our client, uh, over at, uh, uh, the sheriff's department, uh, headquarters. So they had already gone over. They had, they had relied on. Seems like fabricated information, certainly untrue information. Uh, and, and there's no doubt, uh, but the judge case relied on that information. Can't take it away. Can you, can you, can you, can you counsel, can you answer a question that I was asking your adversary as to the time relationship between the application for the search warrant and the interview, uh, by the federal agent of Lucas at which Lucas admitted to substantial narcotics dealings. Did that interview happen before or after the application for the search warrant? Your honor, it's our under, it's our recollection. And I just talked to him with Mr. Singer about it, um, for a couple of seconds, direct election that the search warrant took place before the information was gleaned from the conversation or the interview with Mr. Lucas at the sheriff's office. And it's clear because the information given by, if the information given by to the agents in that interview about his own dealings in narcotics, which included his mention of a substantial amount of money in the safe, uh, in the comfort in that clearly would have, would have given an adequate basis for probable cause for the issuance of a search warrant for the search of the room. But if it, if that information was not acquired until later, it obviously didn't serve in any way to support the issuance of a search warrant. Yes, your honor. And I agree, your honor, that if it had been learned, the government could argue. Um, that could have provided probable cause problem was it was never provided to judge case. So if you look at the four corners, I hate to be our case. I'm a little old, your honor. I talk about little cases, but if you look, if you look at the four corners of the search warrant, including the in-camera notes of judge case, that information was never provided to him. So whether or not it was later or before, and we believe that the warrant was executed before the conversation took place over or was completed over at sheriff's headquarters. Um, number one, we believe it was before it was executed prior to the search warrant was obtained prior to that. But number two, even if the information was known to the police officers, as a result of the conversation, it was never made known to judge case. And with all due respect, your honor, I don't believe that that information, uh, could be considered at this point in time because the judge was never provided with that information. And again, under us versus Ventresca, you'd have to look at the four corners of the warrant and can't go outside the four corners of the warrant. So either way, I think your honor, our position is correct. So our position is not simply, um, that there's a change. We believe that there is a change here based upon what took place in the parking lot, but separate and apart from that, your honor, there were strong issues that were raised relative to our request for a Frank's hearing. And the hearing was denied by the, uh, by the court. And tell us again, what was the false? What was the information, um, uh, revealed in the, in the issuing judge's notes that was false. It indicated in the notes, your honor, that, um, Dominic Daniels had gone to room 113. Uh, they didn't know that they indicated that they had met with, um, Mr. Lucas at room 113. That never happened. Uh, they indicated that he had purchased cocaine from Mr. Lucas at room 113, that none of that was true. Your honor, none of that information was true. And that was important because that was the nexus that they tried to to try to show that room 113, um, that they could find some contraband or something of interest or evidence at that room when in fact the information provided, uh, which created the nexus to room 113 did not exist. Well, it seems to me that, um, that, um, uh, if, uh, uh, uh, judge Cabranes agrees that you should have the opportunity to respond to the information to the document submitted by the government, uh, answering the questions that I, that I put. Yes. Let me perhaps, uh, circle around as is now said, um, to give, give a schedule to the government and council. Ms. Gregory, uh, as I noticed, we have 15 volumes of the joint appendix and, um, it is possible that the answer, the answer to some, or all of these questions may be found in those 15 volumes, but in any event, the government supplemental letter brief of no more than 15, 15 double-spaced pages will be due by no later than Monday, June 28th at 12 noon to respond to the and perhaps to the related question of whether a Frank's hearing before the district court would be appropriate or necessary defense council shall have a comparable opportunity to submit a response to the government supplemental submission that is a maximum of 15 double-spaced pages by no later than 12 noon, and let me add, add a bit of advice or guidance with respect to these submissions, which are important to all three of us, I encourage both sides to rely on the material in the joint appendix of 15 volumes to the extent possible, but of course we will welcome any other relevant or probative evidence or citations to authority. Uh, so are there any questions, Ms. Gregory of what we expect? No, your honor. That's fine. And then defense council, any, any questions about our expectations? No, thank you, your honor. We appreciate that. That's fine. And of course, in the nature of things, these letters will, will presumably have, uh, suggestions about how the case could be disposed of when we are, when we take it under submission and we will be taking it under submission as of July 2, 2021. Thank you very much. Thank you, your honor. All right. Well, otherwise reserve decision. And I asked the clerk to close court court.